[1] This is a proceeding to determine the ownership of certain shares of corporate stock as between plaintiff, Morris Zorensky, and his sister, defendant Mollie Morrison. From a judgment and decree in plaintiff's favor, defendant Mollie Morrison has duly perfected her appeal to this court.
[2] The question at issue is primarily one of fact.
[3] The central figure in the controversy is one Louis Zorensky, who died in August, 1945.
[4] Originally Louis Zorensky had been engaged in the men's retail clothing business at 2600 Franklin Avenue, in the City of St. Louis, in partnership with his brother, Hyman Zorensky, under the name of Zorensky Brothers.
[5] In 1927 or thereabouts one Louis Morrison married Mollie Zorensky, the sister of Louis and Hyman, and about a year later went to work for the two brothers at the Franklin Avenue address.
[6] In 1935 Louis and Hyman dissolved their partnership, following which Louis went into business alone at 5964 Easton Avenue, in the City of St. Louis. However he still carried on his business under the name of Zorensky Brothers, and his brother-in-law, Louis Morrison, went along with him and continued in his employ at the new location.
[7] So things remained until April, 1940, when Louis Zorensky had his business incorporated under the name of Wellston Clothing Company, with a paid-up capital stock of $22,200 represented by 222 shares of a par value of $100 each. The sum of $22,200 comprised the value of the assets of the business that Louis Zorensky had conducted at the premises since 1935. The persons acting as incorporators were Louis Zorensky, Morris Zorensky, and Louis Morrison. Certificate No. 1 for 144 shares was issued to Louis Zorensky, and Certificate No. 3 for 14 shares was issued to Louis Morrison in payment of a bonus of $1,400 due him at the time of the incorporation of *Page 853 
the company. Certificate No. 2 for the remaining 64 shares was issued in the name of plaintiff, Morris Zorensky; and it is such block of stock that is the subject matter of the present controversy, with Morris Zorensky contending that he was at all times the owner of the stock as the certificate indicated on its face, and with Mollie Morrison insisting that she was the actual owner of the stock, and that the certificate had been issued in the name of Morris Zorensky as straw party or trustee for her. The details of the incorporation were handled by Mr. Sam Kessler, an accountant and member of the local bar, who has since represented the company as its attorney.
[8] In February, 1943, Louis Zorensky transferred 15 of his shares of stock to Louis Morrison, and the following year he transferred 25 shares to Mollie Morrison, leaving him owning 104 shares at the time of his death in August, 1945. Thereafter both Morris Zorensky and Mollie Morrison sought to purchase the stock belonging to the estate of Louis Zorensky; and on October 2, 1945, pursuant to authority obtained from the probate court, such 104 shares were sold to Mollie Morrison for $9,000 by Gussie Zorensky, the widow of Louis Zorensky, and the administratrix of his estate.
[9] At the time of the incorporation of the company all of the stock certificates were turned over to Kessler for safekeeping in his safe deposit box. The company, it seems, had no safe deposit box of its own. During the period of the operation of the company it was the practice for Kessler to write up the minutes, whereupon Morrison, as secretary of the company, would take the minutes to Morris Zorensky's place of business to obtain Morris' signature. Morris Zorensky had no actual part in the business of the company, but was engaged with his wife, Fannie Zorensky, in the operation of a cigar store at Ninth and St. Charles Streets in downtown St. Louis. At some time during this period Morris Zorensky's blank indorsement was placed on the back of Certificate No. 2, and the certificate then returned to Kessler's office. There seems to be no question that the signature was actually that of Morris Zorensky, although he denied any knowledge of such indorsement, and disclaimed any intention to have indorsed the certificate. On October 5, 1945, two months after Louis Zorensky's death, the three then stockholders, Mollie Morrison, Louis Morrison, and Morris Zorensky, met in Kessler's office in regard to the affairs of the company. Also present were Mr. Morris Shenker, an attorney, who represented Morris Zorensky, and Kessler, who was acting on behalf of the Morrisons. In the course of the meeting Certificate No. 2 was turned over by Kessler to Morris Zorensky, who later, upon Shenker's advice erased what purported to be his blank indorsement upon it.
[10] So far we have only stated the facts about which there is no dispute. Matters in controversy are reserved for a subsequent portion of the opinion where it will be necessary to weigh conflicting claims in arriving at the ultimate decision in the case.
[11] On July 16, 1946, Morris Zorensky instituted this proceeding by filing a petition in which, after setting out the issuance of Certificate No. 2 in his name and his election as a director of the company, he alleged that the defendants, Wellston Clothing Company, Mollie Morrison, and Louis Morrison, were claiming that the equitable ownership of the 64 shares of stock represented by such certificate was in Mollie Morrison, and were refusing to recognize him as an actual stockholder or to permit him to participate in the affairs of the company. He further alleged that such action on the part of the defendants was not only preventing him from exercising and enjoying his rights and privileges as the owner of the stock, but was also casting a cloud upon his title, all to his irreparable injury, for which he had no adequate remedy at law. His prayer was that the court adjudge and decree that full legal and equitable title to the 64 shares of stock was vested in him free and clear of the claims of defendants, and that the court enjoin the individual defendants from refusing to permit him to exercise all of his rights and privileges as the owner of such 64 shares of stock in the defendant corporation. *Page 854 
[12] In their answer, defendants admitted that Morris Zorensky had at all times been shown of record to be the owner of the 64 shares of stock, but denied that he had ever been the actual or beneficial owner of the same, and alleged instead that Mollie Morrison was the true owner.
[13] Further answering, and by way of what she denominated her individual counter-claim, defendant Mollie Morrison alleged that she had at all times been the actual and beneficial owner of the stock; that the shares had been placed of record in the name of Morris Zorensky merely as a matter of convenience and accommodation; that at the time of the issuance of the stock, Certificate No. 2, which had been issued in the name of Morris Zorensky, had been immediately indorsed by him in blank and its possession surrendered; that on October 5, 1945, by fraudulently representing that he was purchasing said shares of stock, Morris Zorensky had obtained possession of Certificate No. 2, and had since refused to surrender possession of the same; and that Morris Zorensky's possession of the certificate cast a cloud on her title and made it impossible for her to have the company issue a certificate for said shares in her own name. Wherefore Mollie Morrison prayed that the court adjudge and decree that full legal and equitable title to the 64 shares of stock was vested in her free and clear of any claim on the part of Morris Zorensky, and that the court issue an order directing Morris Zorensky to surrender possession of the certificate to her.
[14] Subsequently there was a change in counsel for Morris Zorensky; and when the case was called for trial, his new counsel, in view of the fact that Morris then had possession of the certificate about which the controversy hinged, dismissed the petition without prejudice, and permitted the case to be tried on Mollie Morrison's counterclaim. Laws Mo. 1943, p. 385, § 103, Mo.R.S.A. § 847.103.
[15] After hearing all the evidence, the court entered a decree that Mollie Morrison was not the legal or equitable owner of the 64 shares of stock represented by Certificate No. 2, and that Morris Zorensky was the legal and equitable owner of the same.
[16] Mollie Morrison thereupon filed her motion for a new trial; and the same being overruled, she gave notice of appeal, and by subsequent steps has caused the case to be transferred to this court for our review.
[17] Inasmuch as Certificate No. 2 was issued in Morris Zorensky's name, he is presumptively the owner of the stock represented by it. 18 C.J.S., Corporations, § 264. However such presumption is a rebuttable one, and the question here is whether Mollie Morrison may be said to have established that notwithstanding Morris Zorensky's designation on the face of the certificate, she was none the less the owner of the stock, and he but a straw party or trustee for her. The burden of establishing such fact was of course upon her, not only because the presumption operated against her claim, but also for the reason that since the case was tried upon her counterclaim after the dismissal of plaintiff's petition, she and Morris Zorensky for all practical purposes changed positions, with her becoming the plaintiff or party having the affirmative of the case, and with him assuming the status of defendant. Clark Real Estate Co. v. Old Trails Inv. Co., 335 Mo. 1237, 76 S.W.2d 388.
[18] In support of her claim that she was the owner of the stock by virtue of a gift from Louis Zorensky, Mollie Morrison had evidence to show that after Louis Zorensky started in business on Easton Avenue in 1935, she had rendered substantial services in the operation of the store on an average of from two to four days a week, and that she had been paid nothing for such services. Morris Zorensky, on the other hand, had never devoted any time to the business, but instead had been exclusively occupied with the operation of the cigar store which he owned in conjunction with his wife.
[19] It seems to be Mollie Morrison's theory, as she sought to show by her husband, Louis Morrison, that at the time the Wellston Clothing Company was incorporated, Louis Zorensky, being the owner of all *Page 855 
the assets which went into the capital of the corporation, made her a gift of the 64 shares evidenced by Certificate No. 2, but had the certificate issued in the name of Morris Zorensky in order to conceal the transaction from his wife, Gussie Zorensky, who allegedly had an intense dislike for her because of her efforts in assisting Louis Zorensky in successfully defending an incompetency proceeding which Gussie had instituted against him about 1938. As a matter of fact, according to Louis Morrison's testimony, Morris Zorensky had asked his brother Louis to give the stock to Mollie.
[20] On objection of counsel for Morris Zorensky, the court excluded Louis Morrison's testimony in respect to what Louis Zorensky had allegedly said by way of explanation of why he was giving the stock to Mollie Morrison but was issuing the certificate in the name of Morris Zorensky, whereupon Mollie made an offer of proof as to the testimony Louis Morrison would give regarding statements made to him by Louis Zorensky in the presence of Morris Zorensky. The basis of the court's exclusion of such testimony was that inasmuch as Louis Zorensky was dead, Louis Morrison was incompetent to testify regarding any conversation between the two in reference to the matter in litigation. Sec. 1887, R.S.Mo. 1939, Mo.R.S.A. § 1887.
[21] Mollie Morrison complains, and we think correctly so, that the court was in error in excluding Louis Morrison's testimony. The cause of action in issue and on trial was distinctly one between Mollie Morrison and Morris Zorensky. While each of them claimed through Louis Zorensky, he would have had no interest in such cause of action if living, and his estate had no interest in it now that he was dead. The statute therefore has no application to the case, but even if it did, it could not extend to the testimony of Louis Morrison. He was in any event not a party to the transaction or cause of action in issue and on trial, nor does Mollie Morrison in anywise claim under him; and in such situation he could not have been disqualified as a witness. Joseph v. Joseph, Mo.App., 164 S.W.2d 145. But while the testimony in question was erroneously excluded, the error of the court does not require a reversal. The offer of proof was full and complete, and this being a suit in equity, we are at liberty to consider such evidence just as though it had been admitted by the lower court. Gill v. Newhouse, Mo.Sup., 192 S.W. 431; Central Missouri Oil Co. v. City of St. James, 232 Mo.App. 142,111 S.W.2d 215.
[22] However an outstanding weakness in such explanation of the transaction is that at the time of the incorporation of the company when Louis Zorensky made the purported gift of the stock to Mollie Morrison, he and his wife, Gussie, were not living together, and in fact had been separated since the time the Morrisons were married in 1927. Consequently it seems highly improbable that Louis Zorensky would have felt any necessity for concealing a gift to Mollie Morrison in 1940, even if it were true that Gussie entertained ill will for Mollie, but not for Morris Zorensky. However it does not appear that Gussie held any such hatred for Mollie as the latter claims. On the contrary, it will be recalled that upon Louis Zorensky's death, when both Mollie and Morris were competing for the opportunity to purchase the 104 shares belonging to the estate and thus gain control of the business, Gussie, as administratrix, sold the stock to Mollie, although there was evidence that Morris was prepared to pay $1,000 more than any sum that Mollie might have offered.
[23] Despite the presumption in his favor, Morris Zorensky did not rely upon it exclusively as the basis for his claim of actual ownership of the stock, but instead offered evidence suggestive of a consideration for the issuance of the 64 shares to him. Louis Zorensky had been in ill health over a period of years, and there was testimony to show that Morris Zorensky had devoted considerable time to his brother in taking him to the doctor and the like. Much of this testimony came from Morris' wife, Fannie Zorensky, and was weakened by the fact that while she testified to extensive services rendered by her husband, *Page 856 
she was unable to recall either the name or the location of the hotel where Louis Zorensky had been living at the time. Fannie also testified that prior to the incorporation of the company, Morris had loaned Louis from $6,000 to $7,000, with the inference to be drawn that the issuance of the stock was intended, in part at least, to be in payment of such indebtedness. Mollie Morrison comments in her brief that Morris had taken no notes to evidence any such indebtedness. However she herself testified that "none of us in the family ever asked for notes from one another".
[24] Still another matter in dispute had to do with the manner in which Morris Zorensky's blank indorsement was placed on Certificate No. 2.
[25] The record offers two inconsistent explanations on Mollie's part.
[26] The one, which was embodied in her counterclaim, was that at the time of the original issuance of the stock, the certificate was "immediately" indorsed by Morris, and its possession surrendered to Kessler for safekeeping along with the other certificates. She had previously advanced the same theory in a letter prepared by her counsel in which she used language to the same effect. However her husband, Louis Morrison, testified that in 1941, a year after the incorporation of the company, he obtained the certificate from Kessler and took it to Morris Zorensky with the explanation that he wanted it indorsed in blank so that if anything should happen to either of them or to Louis Zorensky, Mollie would not become involved in any dispute or disagreement with the other members of the family concerning the ownership of the stock. Louis Morrison further testified that Morris readily acquiesced in the suggestion, indorsed the certificate in blank, and handed it back to Morrison, who then delivered it back into Kessler's hands for safekeeping.
[27] As we have already pointed out, Morris Zorensky claimed to have had no knowledge of having indorsed the certificate, and denied any intention on his part to have placed his indorsement upon it. The only explanation he could offer was that Louis Morrison had on some occasion evidently procured his signature by placing the certificate among the minutes which were submitted for him to sign. There seems to be no question but that the two Morrisons enjoyed Morris Zorensky's absolute confidence, and the latter testified that whenever Louis Morrison would bring the minutes to him, he had been accustomed to sign them without inquiry. However there was an inconsistency in his testimony as to when it was that he had erased the indorsement. He said on the stand that upon receiving the certificate at the meeting in Kessler's office on October 5, 1945, he immediately took it to his own office and erased his signature, and yet when his deposition was taken in May, 1947, he had testified that the certificate was at that moment in his safe deposit box with his name still appearing on the back of it.
[28] There were wide discrepancies in the evidence regarding the circumstances under which Kessler turned the certificate over to Morris Zorensky.
[29] According to Mollie Morrison's version of the facts, she had previously agreed to sell the 64 shares of stock to Morris for the sum of $5,000, and at the meeting in Kessler's office authorized Kessler to deliver the certificate to Morris. On December 14, 1945, she wrote Morris, calling his attention to what had transpired, and advising him that unless the full purchase price was paid her by December 22nd, she would rescind the sale and demand the return of the certificate for cancellation and reissuance in her own name.
[30] Morris Zorensky's account of the transaction, as it appears from the testimony of his attorney, Morris Shenker, was that the proposal was the other way around, that is, that Mollie Morrison had offered to pay Morris Zorensky $5,000 for the 64 shares of stock, which offer was refused, with Shenker then making a counter offer to buy all of her shares for the cost to her of the 104 shares she had purchased from Louis Zorensky's estate, plus $5,000 for the additional 25 shares she had previously owned. Morris Zorensky's evidence was to the effect that there had been no question *Page 857 
raised regarding his ownership of the 64 shares of stock, and that Kessler had turned over the certificate without objection from the Morrisons.
[31] Along with all these matters was a most serious inconsistency in Mollie Morrison's own case regarding so material a feature of the case as the time and manner in which she had allegedly acquired the 64 shares of stock. In her counterclaim she pleaded that she had at all times been the actual owner of the stock, which had been issued in Morris Zorensky's name merely as a matter of convenience and accommodation. She relies on the same theory in urging her case on this appeal. However in her letter to Morris Zorensky on December 14, 1945, she stated that such stock had been the property of Louis Zorensky, and that she had purchased the same from his estate on October 2, 1945. This of course could not have been true, since what she had purchased from the estate had been the 104 shares which had concededly comprised all the stock owned by Louis Zorensky at the time of his death. Her counsel who prepared the letter undertakes to assume full responsibility for the mistake, and the thing would not be so important were it not for the fact that Mollie Morrison herself testified to the same effect both on direct and cross-examination. The matter goes to the very heart of her case, and it would seem that for her to overcome the presumption arising from Morris Zorensky's designation on the face of the certificate, her own evidence should not be so contradictory within itself regarding the circumstances under which she allegedly acquired her title.
[32] We have already pointed out that as the case was tried, Mollie Morrison had the burden of establishing that she was the owner of the disputed 64 shares which had been issued in the name of Morris Zorensky. In the face of all the facts and circumstances, we cannot say that she successfully bore her burden. Not only did she have no clear idea of the basis upon which to assert her claim of ownership, but if we are to assume that she relies upon a gift at the time of the incorporation of the company, she does not offer a very convincing excuse for putting the stock in the name of Morris Zorensky. As we have said before, the idea that Louis Zorensky was endeavoring to conceal the transaction from his wife, Gussie, is not at all persuasive in view of the fact that he and Gussie had already been separated for thirteen years. Moreover it will be recalled that when Gussie was finally put to the test of choosing between Mollie and Morris as respects the sale of the 104 shares belonging to Louis' estate, she sold the stock to Mollie at a sacrifice of the $1,000 additional which Morris was prepared to pay. Then, too, there is no explanation for the inconsistency in Mollie's case regarding the time when Morris' blank indorsement was placed on the back of the certificate. If it be true that Morris' evidence likewise left something to be desired, it was not he who had the laboring oar. The certificate had been issued in his name, and he had the physical possession of it. For Mollie to prevail, it would have to be upon the strength of her own title, but upon the record before us it does not appear that she is the owner of the shares in question.
[33] It has of course been our duty to review the case on the whole record, and in reaching our conclusion on the facts we have had due deference for the finding of the trial judge, who, by having the parties and their witnesses personally before him, had an advantage we do not possess in observing their demeanor as it affected the credibility of the testimony they gave. Much of the evidence was in irreconcilable conflict, and in such a situation it is the well considered and established practice for the appellate court, while in no sense abdicating its own special function, to nevertheless give appreciable weight to the decision of the lower court in determining where the fair preponderance lies. Scheer v. Gerleman, Mo.Sup., 221 S.W.2d 875; Green v. Wilks, Mo.Sup., 109 S.W.2d 859.
[34] It follows that the judgment rendered by the circuit court should be affirmed; and the Commissioner so recommends. *Page 858